The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. May it please the Court, this case turns on the immigration impact of an aggravated felony conviction. Just speak up a little, please. This case turns on the immigration impact of an aggravated felony conviction. As the Court knows, aggravated felonies are game changers in the immigration context, and they're categorically different from other kinds of offenses, because they result in automatic deportation, even for aliens with legal status, such as legal permanent residents. Notice that someone is at risk of removal, or faces the possibility of removal, is, as courts have recognized, not sufficient to warn them that they face mandatory deportation under an aggravated felony. The District Court erred in this case in determining that Mr. Nunez-Garcia's habeas claim accrued when he was sentenced in the Eastern District of Virginia in 2016. He knew at that point that he would have to fight deportation, but he did not know, and he was not on inquiry notice of the fact that he had been misadvised by his ---- I'm just ---- it would be nice. We're across the room, and talk as if you're talking in a classroom. Thank you, Your Honor. Is that better? So he did not know, and he was not on inquiry notice of the fact that he had been misadvised by his counsel in his 2010 Western District of Virginia case, and that he had already been convicted of an aggravated felony, making any fight against deportation a futile one. With respect to aggravated felonies, aggravated felonies really are different, and I think that's the first thing that helps to understand Mr. Nunez-Garcia. Nunez-Garcia testified to, because he testified in English, I never knew I was going to get deported until 2016 when my attorney in Alexandria explained it to me. I know it was an aggravated felony in 2016. That's when I know it was an aggravated felony. So if he was on notice in 2016 and he didn't file to 2018, why doesn't that end this case? Because, Your Honor, looking at the totality of his testimony, it's clear that he actually knew in 2018. So previously ---- That's not what he said twice. Well, what he said once was that he knew he found out he would be removed in 2016, or he found out he'd face removal in 2016. But previously in his testimony, he discusses where he got to immigration custody, he received the notice to appear, and then he went to the immigration law library, realized that this was an aggravated felony, and that he had a problem. Looking at his testimony, and he testified that happened in 2018, looking at his testimony as a whole, frankly, it's clear that he had a problem with dates. He also testified that he got his notice to appear in 2008. That wasn't a finding by the district court. It was never raised in the district court. So it seems like you're basically asking us to determine by implication at this point that somehow that's clearly erroneous. Well, Your Honor, the district court relied on a number of facts in determining that 2016 was the operative date. They relied on the advisals that he got in the 2016 proceeding, and they also said he said this in 2000 regarding the notice to appear in 2016. Now, he also testified right after that this happened when he got his notice to appear. He confused 2016 and 2018. If the Court has a doubt as to how to balance the facts in this case, then I would submit again this is a question for the district court. But this was only the question for the district court. Well, that's not exactly what he testified to. As soon as the he said twice, I found out it was an aggravated felony in 2016. Perhaps counsel realized he shouldn't have asked a question he didn't know the answer to because he only asked one more question. And that was, did you find out it was an aggravated felony when you got the notice to appear? And he says yes, which doesn't exclude the fact that he already knew it in 2016. Yes, Your Honor, and then actually that just to build on that a little bit from what I understand about the record, in 2010, he was advised that his conviction could subject him to deportation. And according to him, the testimony of his attorney is a little more inculpating. But according to him, the attorney said, he says, you're not to get deported because you're a citizen. So he knew that he could have faced deportation, but for the fact he was a citizen. He was then told in 2016 explicitly that his citizenship was being revoked. And he was then ordered at the end of his sentence to report to immigration for proceedings, deportation proceedings. And then he says what Judge Agee said, I knew then that I had an aggravated felony in 2016. It almost seems he's playing games by suggesting anything else. He knew what was going on, and then he said his attorney explained everything to him. What's that mean? So let me, there's a few things here, Your Honor. With respect to what he was advised in 2010 or his understanding from 2010, when we look at due diligence, and just taking a step back here to talk about the due diligence standard under 2255F4, you look at due diligence in the individual's particular circumstances. In his particular circumstances, although he lost his citizenship in 2016, he was a citizen in 2010 when he was convicted.  Now, when he is denaturalized at that point, he doesn't lose status. He reverts to the status of a legal permanent resident. When he receives the order of denaturalization, that order states that he is being denaturalized from the date of this order. It says the defendant from the date of this order is forever restrained and enjoined from or benefits of citizenship. And so from his perspective, looking at this, he knows that he's no longer a citizen, but he was a citizen when he was convicted. And so he is still relying on his attorney's advice. Nothing that happens in the 2016 proceeding disabuses him of that understanding. When you look at all of the statements that were made by his counsel or by the court, all of them refer to the immigration impact of the 2016 conviction. Scalia. If that were so, wouldn't he say in 2016, when he's given all this advice, the explanation by his attorney, he says, I knew it was an aggravated felony. He knew he was losing his citizenship. He knew he had to report to immigration for the deportation proceedings. He knew all of these things. Wouldn't he have said, if he thought otherwise, why? He didn't say that. Your Honor, the interesting thing is that unlike most of the cases we see where there's an immigration issue, we have two possible immigration issues and two possible bases for removal. His attorney in 2016 is not wrong. He could have been placed in removal proceedings based on his 2016 conviction. It's a crime involving moral turpitude. The difference is that he would have a claim for relief from removal as a legal permanent resident, just based on convictions of crimes involving moral turpitude. It's the aggravated felony that is the game changer. So this 2016, from his perspective, is kind of a red herring. He hears all of these things, and it sounds to him like they're saying, because of this 2016 conviction, you're going to be placed in removal proceedings. And I might add that everyone discusses this in conditional terms. His attorney in her sentencing memorandum says he will have to fight removal. Now, that's the very language that in United States v. Murillo, this court determined, was insufficient to warn someone who's been convicted of an aggravated felony that they face mandatory deportation. But I'd like to return to the issue of his statements regarding what he knew when. Because he also testified at pages 351 through 354 of the joint appendix that he found out that he had been convicted of an aggravated felony when he was in Florida in deportation proceedings. That is when he received the notice to appear. That's when he gets the notice that says, you are being removed, not based on your 2016 conviction, but based on the 2010 conviction. And that, and he testified that happened in 2008. And the judge said, 2008? And he said, oh, that was my mistake. I meant 2018. So I think the court can reasonably infer, based on his specific testimony, as to where he was and when he was, that he actually knew this in 2018. Later on, we were talking about 2016 and his awareness, his dawning awareness that he would be placed into removal proceedings. And then he said he misspoke, basically. I think that is what the balance of the evidence shows. Now, with respect to, courts have recognized that an alien who recently- Where do you say he misspoke? He misspoke at the point, Judge, that you cited later in the testimony, in the rebuttal testimony, where he said it was in 2016 that he found out it was an aggravated felony. And then I asked, when you got the notice to appear? And he said, yes. He got the notice to appear in 2018. And you think those are mutually exclusive answers? They are, Your Honor, because he is describing when he was in, at the record at 351 through 353, he is describing when he was in immigration custody. And he did not pass into immigration custody until 2018. So, looking at that, I think if the court wants to hang its hat purely on the one time that he says, I found out aggravated felony in 2016, I think there is a serious factual conflict in the record at that point, that the court should send this back to the district court. The district court was not relying solely on that,  in 2016. Now, with respect to those immigration advisals and what he was told, courts have recognized that when an alien relies on an attorney's misadvice, he lacks sufficient notice at that point to challenge his immigration. Well, you know, he explains that, too. And there's a good question of whether the lawyer's advice was wrong at all anyway. But in that same hearing, he talked about how, he says, when I say I was a citizen of the United States, he say he's good to go. So I say never, was never told me that. So I say, I never say, he never told me that. I believe, I never knew, he's speaking a little bit broken here, I never knew in my life I was going to get deported if I signed these questions. That's because he was a citizen of the United States. So he rests all his reliance on his attorney advising him that because he was a citizen, he was protected from deportation. That's his assumption based on the advice of counsel. But at that very same hearing, he's told, now you've lost your citizenship and you are, have to report to immigration. So isn't the natural consequence from that everything he relied on was pulled out from under him at that point? And he also acknowledged that he knew that the earlier conviction was an aggravated felony. And so what more do we need to tell him? Do we need to print out a form or something and tell him this? It's pretty obvious that he thought his protection was based on the advice of counsel. I'm a citizen, I can't be deported. Accurate statement, right? And then he comes in 2016 and he recognizes and he says, that's what I relied on. But in that very same preceding, then, his citizenship is taken away. All right. I understand what you're saying, that, you know, his language isn't perfect and he's putting together historical facts, but it looks to me like the deportation issue came to the table in 2010, which would be unusual because if he really was a citizen clearly at that time, you would never have that in the report. So in the Senate's agreement and in the explanation by the attorney, he sees the deportation and the attorney says, don't worry about that, you're a citizen. That's according to him. The attorney, of course, says more clearly that if you signed wrong and all that other stuff, but let's set that aside.  And then it comes up again in 2016 with a lot more facts. And then he has a statement. His attorney at that point explained everything to him. I see my time is up. May I respond? Yeah, obviously. Thank you, Your Honor. So when he is, when he loses his citizenship in 2016, he loses his citizenship from the notice that he gets as of the date of that order. Now, looking at what he knows, it's saying from this day forward, but he also knows he was a citizen in 2010 when he was convicted. The difference is that I think, and I think this is the mistake the district court made as well, is saying, once you know that you face the prospect of removal, you should be charged with knowing everything else. And I think that that's not how courts have typically construed aggravated felonies. That's certainly not the approach that the Supreme Court took in Padilla, where they said a generalized advisable, advisal about the prospect of deportation is not sufficient. You have to tell someone you will be deported. And so here in 2016, the notice that he's getting is notice about the prospect of deportation. He knows he faces the prospect of deportation. But the real game changer for him and the real issue that changes his status is the aggravated felony conviction. Unusually in this case, the thing that makes a difference for him and for his removal is not as much the loss of citizenship, although that is what enables the things that, the changes that happen to occur, but the aggravated felony conviction. Absent that aggravated felony conviction, he would have had a defense to removal. And so that is the thing that he needs notice of. And he receives neither actual nor constructive notice of that. Thank you, Your Honors. Thank you, Counsel. Mr. Juan? May it please the Court, Kagle Juhann on behalf of the United States. This is a statute of limitations case. And if I may make two points, one about the record and one about the law before going into some of the discussion here today. The first point about the record is one that's been talked about already, is that Mr. Nunez Garcia testified under oath, in black and white in the record, that in 2016 he talked with his EDVA attorney about the 2010 conspiracy conviction. And he went on further to say that that's when he knew in 2016 that that conviction was an aggravated. Mr. Juan, why don't we start, as you did very aptly, that this is a statute of limitations. Correct. Tell me, what is the date that he was deported? The date that he was deported?  I don't have that offhand, Your Honor. You don't have it offhand in a statute of limitations case? Wouldn't that be the triggering as to whether or not someone has to avail themselves of appealing as a result of that? You don't know what the date he was deported? Your Honor, that's not the triggering event. The important thing here is the legal test for F-4 purposes is different from the merits test, the constitutional standard in Padilla. And here today in the briefing and below, I think that has been conflated a little bit and confused. There is the substance of— So you're saying it doesn't matter the date that he was deported? What matters is when he had notice. And this is from this Court's opinion in Caro, which was unpublished, citing the Seventh Circuit. Okay. About statute, does it say who the notice must come from? It says that the individual, the test, the F-4 test, as other courts have said and as this Court in Caro said, is what matters is it's an objective inquiry. And what matters is not knowledge of the law, but knowledge of facts that would put a reasonable person on inquiry notice that they need to have a potential claim here. And so when we— That they have a potential claim. He just had to know the facts, Your Honor. And he didn't actually have to know the facts. He had to be on inquiry notice of facts that gave rise to the claim. And so we have to start by defining— So if he was never— Suppose he was never deported. I mean, so in other words, you just have notice, but something never happened. So then— Like, for example, suppose he was deported five years later. Then his chance to appeal that would be over if he found out five years later he's actually deported, but five years earlier he had what you call notice. It's not what I'm calling, Your Honor. No, no, well, I'm just saying. I'm not—I don't mean that. I'm not trying to twist your words. I'm just saying you said that this was the appropriate notice, correct? Correct. So my hypothetical to you that—my hypothetical to you is that if you get the notice that you said that's enough to trigger inquiry five years earlier, but five years later you're actually deported, you're saying that it would be too late for him to even avail himself of any appeal or that, right? Is that your argument? Your Honor, my argument— Is that your argument? No, sir. Your Honor, it's not. And here's why. Okay. A couple points. One is what matters is notice of what. And the standard is not notice of the bald fact of you are being deported today. It's notice of facts that give rise to the alleged ineffective claim. And so you have to look back to the merits to say, what is the alleged ineffectiveness here? The alleged Padilla error is that his attorney told him, you can't get deported because you're a citizen. Right. So that because, that is the predicate advice. That's the key fact. It's the fact of his citizenship that protects him. It's the shield from deportation. So then when you fast forward six years, and he now knows that that shield has been stripped from him, that is the critical fact or one of the critical facts—it's the easiest one to rely upon—that puts him on notice. Okay, you're alleging that in 2010 your client made or your counsel made a Padilla error. It's not a Padilla error because he was advised accurately. But setting that aside, he didn't have to be noticed on notice of the bald fact of you're being deported now. What created the notice was the alleged advice. The predicate is now gone. And I would direct the Court to this Court's opinion in Gaston. It's cited in the briefs. It's a published case. And the Supreme Court's subsequent endorsement of that test in Johnson. And those cases are important because they involve a situation where there's a predicate fact that is based upon a Federal sentence. So those are career offender cases where there's a predicate fact of conviction in the State court. And then that predicate state conviction is overturned later. And what Johnson says and Gaston says is, when that predicate is gone, that's when the clock starts ticking for F-4 purposes. And that is like this case, except the predicate here is the status of citizenship. And so once he knows in 2016 when he's sitting in the Alexandria courtroom and his attorney has said, you're going to enter into deportation proceedings, and he's told by the judge, you've lost your citizenship. He knows what he was advised before. Citizenship is your shield. And now he's on inquiry notice. And this is where it's important to focus on what the F-4 statutory standard is. It's an inquiry notice standard. That is a separate analytical box from what the Padilla analysis is. And in the briefing in here today with the citation to Murillo, Akinzade from this Padilla, Murillo, Swabi, those are all merits Padilla cases where you take the alleged advice and are asking on the constitutional question, has this individual specifically been disabused of the allegedly wrong legal advice? It's more akin to an actual knowledge standard. But in the F-4 context, in the statutory context that Congress has crafted this statute, it's an inquiry notice objective test based on the totality of the circumstances. And what matters are facts, not the legal significance that follows. What if the judge had told him, I don't know what this portends for your immigration status? Would that change the case? Which judge, Your Honor? The judge in 16. If that judge had said. I'm not sure what this portends for your immigration status. He's still on notice that the citizenship has been stripped from him. And he's on notice because he because he was convicted of a statute. On the aggravating offense, right? He's on notice under 1425. That conviction carries with it a mandatory stripping of a naturalized citizen's citizenship when you procure your citizenship by fraud. So it's mandatory. The stripping of the citizenship under 1425, yes, is my understanding, is mandatory. And the district court, of course, orally advised him of that at the time. But that's the stripping of citizenship is included in a district court's order in that circumstance. That's correct. There is a separate order that's also entered in the record, in the EDVA that's part of the record in this case. Well, I guess these questions that Judge Gregory are raising, you know, they're good questions, I think, in regard to determining an F-4 claim. And I'm wondering, really, the difficulty in this case is the claim is that my counsel was ineffective in 2010. That's a Strickland claim. And if he says the ineffective assistance was because I received the following advice, that if I was a citizen and therefore I would not be deported, even though he was told the possibility of deportation. So he, the ineffective claim is my lawyer told me because I was a citizen, I would not be deported. The difficulty is that's probably, as he stated it, is probably not an ineffective claim. That's an accurate statement. Correct, Your Honor. And so the difficulty in this case for the courts and for him is when does he have an ineffective claim? When does he ever, is he ever able to say that the lawyer was ineffective? And his argument has to be that somehow I'm shielded forever by that advice and he didn't tell me that I'm not shielded forever. And so then if you accept that as the object of the claim, the 2255 claim, I suppose that in 2016 when he's before the judge and he has his citizenship revoked and he's told to report to immigration, does that at that point make the judge, make the lawyer's statement in 2010 ineffective? Your Honor. Actually, he has to be maintaining that, right? I mean, I don't know what aspect of the lawyer's advice was he's relying on his Strickland claim. He's basically saying if I knew I could have gotten deported, I wouldn't have pled guilty. That's basically the underlying thing. I don't know how that gets him a lot because then, but let's assume that he pled guilty because his lawyer advised him he would not be deported because he's a citizen. So in 2016, the citizenship is removed and he's ordered to be deported. So at that point, that's the only point in time he could conclude that his lawyer was ineffective. It's not a question of whether he would be deported. It's a question of whether his lawyer was ineffective. So when did he learn that his lawyer was ineffective or when does he, could he claim that his lawyer was ineffective? And I suggest that maybe the only thing he could claim is that I thought I was going to keep my citizenship forever and I would never be deported. What a couple of responses to that, Your Honor. One is that even if that were to be the nature of the alleged error here, that the attorney in 2010 didn't say more and speculate about future, you know, well, but if this lawyer finds out about that and it prosecutes you, then you could be stripped of your citizenship and then you would be deported, that's not a Padilla error either because Padilla talks about the immigration consequences to be triggered, the Padilla duty. They have to be clear and certain. And so when there are speculative immigration consequences, that's not a Padilla error either. So our position is this — I'm trying to take it from the Petitioner's point of view here. And his point of view is I was told that I would not be deported because I'm a citizen. And he repeated that numerous times. At 349 is one example. Yeah, yeah, yeah. He repeated it. So that's not an issue. So now he claims that that is the ineffective advice he got. So then the question comes, when did he learn that that was ineffective? And the only thing I can speculate to trigger the — to trigger the exception to the one-year limitation period — of course, the limitation period runs from 2010 for one year. He gets a suspension of that to the extent he didn't know and — with inquiry notice. So my — I guess my question here, and I probably should pose it to his lawyer, but it seems to me when — it's not when he knew he would be deported. It's when did he learn his counsel was ineffective under Strickland, or when should have he known that his counsel was ineffective under Strickland? Of course. And it seemed to me, if you phrase it that way, he learned almost everything he ever learned in 2016, to the extent he assumed differently. I think, Your Honor, that is generally correct. That is essentially what the district court said in its holding about the importance of 2016. Of course, below, although the district court didn't rely upon this grounds, the government's position — Well, I'm troubled a little bit by the focus on deportation and when's he learned he's going to be deported and all that. And it seems to me, when you're talking about whether an attorney is ineffective, that isn't the issue. The question is, he was given information in 2010 which he alleges was ineffective advice. And so now the question is, when did he learn that that advice was ineffective or wrong?  And that's the question he learned at 2016. I think that's right, Your Honor. I mean, I think — I think he learned about it in 2010 when his — I shouldn't be asking you. I should be asking your colleague this question. But that's — I had trouble with this in reading this record is — I'm sitting there thinking, well, what was wrong with that statement by the attorney? And then the attorney himself testifies and explains that there was some doubt about the truthfulness of questions to obtain citizenship. But the — I think the — Garcia really disputes that and really says, I was told that I would not be deported because I'm a citizen. And so deportation was on the table. That was his concern. He got advice about that. That particular statement, without more, is not inaccurate. It's not wrong. And so now the question is, he said, I pled guilty because of that advice. I wouldn't be deported because I was a citizen. It seemed to me the first time and maybe the only time he would learn that advice was challengeable was when the citizenship was, in fact, taken away. And he was then going to be put in deportation. So he was put on inquiry notice by — Well, more than that. He was told that that advice was either right or wrong, or the assumptions he built into that advice. In other words, the inquiry notice is just — is a broader protection for the government. Correct, Your Honor. But — You're right. I mean, I think the fact that he knows what he knows in 2016 makes the case for the — for affirmance an easy one. Now, of course, the government below has — has argued and the court, I think, could affirm on this grounds. It could also affirm on the grounds that are apparent in the record that there's just no Padilla error here. The court can always affirm on grounds that are apparent in the record. And it wasn't erroneous advice to say what was true at the time. Your citizenship shields you. But setting that aside, he's advised by the magistrate in 2010, there may be deportation consequences here. And so when you read the Clark case out of the Seventh Circuit that — that we cite in our brief, that's — that's that case. I mean, that's an individual who was a non-citizen even who was on inquiry notice and is told, you know, there could be deportation consequences. Again, and that's — Clark is an F-4 case. And I understand that that factual scenario might not meet the substantive standard under Aiken's aid or arguably wouldn't under this Court's merits Padilla cases. But on the F-4 inquiry of inquiry notice, which is a lesser test, it's a more — it's a harder test for a defendant to satisfy that in 2010 he's on notice. And certainly by the time you get to 2016, he's told you have no — Yeah, but see, the notice — you keep coming back to my problem. The notice isn't notice of deportation. The notice is ineffective assistance of counsel, erroneous notice. Whatever the — if the attorney gave him — told him illegal advice, then the question is, when did he learn it was illegal? And so it's not a question of when he would be deported. It's a question of — he was concerned about deportation. He asked about it because he was advised about it. And he was assured, you're a citizenship, you won't be deported. But the question is now, he claims that that was improper advice. And I don't understand fully what he's saying. And I'm — to give him the benefit, I'm assuming that what he's saying is I thought that was perpetual as long as I was a citizenship — citizen. And I can't read anything else into it because he said he testified twice, never in my life did I think I would be deported. And I think that's because he was a citizenship — citizen. But the only time — first time he gets some inkling — actually, he gets actual notice that that is a misstatement or misassumption is when he actually loses his citizenship and is told now to report to the immigration authorities. Anyway, it makes it a little dicey as to how to answer Judge Gregory's questions is when is the — does the statute run? And I think the statute runs when he's on imputed notice that his — he has a claim. And his claim here is a Strickland claim. Your Honor, the — our position, based on Caro and based on the — citing the Seventh Runs, when there's imputed notice of facts, not their legal significance. And so then the question is, what are the facts that would put a reasonably diligent person on notice of a potential Strickland claim that they ought to relate back and start investigating? And so by 2016, he knows his plea agreement in 2010 says you may be deported. He knows that WDVA judges told him that, too. He knows he's not a citizen. He knows from what the EDVA attorney has told him that — He doesn't know he's not a citizen until 2016. Correct. Correct. So the inference, the assumption he has to be making is that he assumed his citizenship would protect him forever. In other words, it was not dependent on his citizenship. And so, I mean, he's reading into that vice. As he explains, that I was told that because I was a citizen, I wouldn't be deported. That's all that he reports. But he has to be assuming, in order to have a Strickland claim, that there was more to that. He assumed it probably was more permanent. My point is, I suppose, is that that assumption is opened up and undermined by the fact that in 2016, not only did he lose his citizenship, but he was then told he was subject to deportation. And apparently, it might have all been explained in greater detail because he said, my attorney explained it all. I knew it was an aggravated felony and this type of thing. But I think the focus has to be on what he assumed was ineffective assistance of counsel and when that assumption of an ineffective assistance was known to him. And I don't think that has anything to do with the actual facts in the world. This is a 2254-5 claim. So, Juwan, what's the date you said he lost his citizenship? It would have been January 8th, 2016. And he actually lost it. Yes. Yes, he is. Yes. And that occurred by what process? That occurred by the process of in the 1425 prosecution in the EDVA, when he is charged with that crime and convicted of that crime. And then at the sentencing, there's the presentation of the order to Judge Tringa to denaturalize him. And so that was the process. That was what the litigation was essentially about. I mean, that was the core thing. It seems to me the judge entered the order right in the proceeding, didn't he? Correct, yes. He signed it right there and told him he was signing it. Yes, it was handed up in court. I think the record reflects that the judge asked the — I think the defense attorney even said at one point in time, you know, I understand the government's going to present a denaturalization order to the court. And at one point in time, the judge says, you know, do you have an order for me? The government hands it up. And that's the denaturalization order that is entered while he's there in that proceeding in 2016. Is there no further question? I thank the Court. We ask that it affirm. Thank you, Mr. Juwan. Ms. Trotten, you have some time left. Thank you, Your Honor. So my colleague was asking what's the fact that he was — that he should have been on notice of. And the Seventh Circuit recognized in Clark that misadvice by counsel is a fact. And so that — You know, we don't need to go to the fundamentals of the cases. Let's focus on this case. He claims that his counsel was ineffective in giving him advice in 2010. And the ineffective claim he makes is that my counsel told me I would not be deported because I'm a citizen. And deportation was on the table, and he was told about it. But he was assured because he was a citizen, he would not be deported. That's the ineffectiveness, right? Yes, with one — one slight adjustment here. And I think it's important to recognize he was told he would not be deported or he understood he would not be deported based on that conviction. Yes. This doesn't occur in a vacuum. It occurs with respect to the 2010 methamphetamine conviction. They're talking about — they're talking — the only conviction on the table was the 2010 conviction, and they're talking about it. And he gets this advice, and the attorney tells him, because of this conviction that's all before them, you're not going to be deported because you're a citizen. Yes. That's ineffective, he says. Now, the first question is, what's ineffective about that? What's wrong about that? And my assumption is he must assume that he'll never be deported as long as he's a citizen, or he'll never be deported. I don't know what the assumption is, but let's just say it's one of those two things. He's dissuaded of that in 2016 when the facts proved to the contrary. So now he knows that what the attorney meant is, so long as you're a citizen, you won't be deported. And he was told, you're no longer a citizen and you're going to be deported in 2016. And but not only that, he doesn't focus on that action. He talks about recognizing it's an aggravated felony that's causing the problem, and he knew of that fact in 2016. And his attorney explained it all to him. Now, the question is, when did he learn of his Strickland claim? Not whether he's going to be deported. So you've got to focus first on what was the ineffective advice that he learned, and when did he learn it? He learned it in 2018 when he got a notice to appear that said, you're going to be removed based on this aggravated felony conviction. Up until that time, he has not been removed. What was ineffective? What did the attorney say wrong? The attorney said, you're not going to be removed based on this conviction. No, he did not. He said, you're a citizen. He didn't talk about the conviction at all. It was that implied. What he said is that because you're a citizen, you will not be deported. The only thing he was advised, that his shield was based on his citizenship, and he repeated that two or three times, as did the attorney. Yes, Your Honor. Okay. Well, I'd like to know what aspect of that was wrong, and when did he discover the aspect that was wrong? And I'm giving him gratuitous assumptions to say that there was some further aspect about that that the attorney said, well, if you aren't a citizen, you're going to be deported, which is the flip side of that. Maybe he's relying on that, or maybe he's relying on the fact that he'd never be deported, because that's what he said. I never thought I'd ever be deported. But both of those, both of those assumptions, which I'm not sure he's allowed to read in that, because at that point in time, he knew of the facts. He knew of his difficulties with his citizenship. But quite apart from that, he clearly knew that his assumptions were wrong in 2016. And it didn't make the advice wrong. It just made his assumption about that advice. But I don't know what your position is as to what was error in that advice by the attorney. So the substantive Strickland claim I could certainly go into, but probably not in 43 seconds. Well, that's the whole claim. This is a 2255 based on Strickland. It is, but we're talking about timeliness here. Now, the actual — No, but the timeliness is based on knowledge of the claim. Yes. And the claim is Strickland. Yes. And so the error that his attorney committed was in telling him, when they're talking about you won't be deported because you're a citizen, they're not talking about it in a vacuum. As you recognize, they're talking about it with respect to this methamphetamine conviction that he gets. When he gets his plea agreement, he testified that he goes and he talks to his attorney and he says, what about this? He says, I face a possibility of removal. And he says, don't worry about it. You're a citizen. So looking at that in the totality — That's accurate, right? As long as — when he is a citizen. Now, the difficulty is his attorney realized — He should have given advice that if you lose your citizenship, you're going to be deported. That's what you're saying was ineffective. In other words, he didn't add on that if you lose your citizenship, you'd be deported. Well, his attorney recognized that his citizenship was problematic. Yes. He told him he wouldn't — he — And his attorney, if you accept that, you have to accept the attorney's advice. And the attorney told him that. And the attorney told him if you're not a citizen, then you're in trouble. Well, again, when we get to weighing the evidence, these are questions that the district wanted to reach. I'm not — I'm trying to give him the benefit of doubt in excluding the attorney's evidence. In other words, I'm trying to focus on his claim of ineffectiveness. And his claim of ineffectiveness is the one statement, and that's all he said. So you're suggesting that something implied in that statement where you said if you're a citizen, you will not be deported, he didn't say because you are a citizen, you will not be deported, something in that is ineffective? Yes, Your Honor. And that's set forth in the briefing. I see my time is up. May I — may I respond? Well, counsel — counsel, yes, you may respond. But I have some question to you — question to you is this. Because — I'll give you time. Obviously, all these cases are important, and this is certainly very important. Make sure I understand your position. In 2010, as I think as Judge Nehemiah has aptly said, that's where the Padilla problem comes — two things. You're a citizen, so you're good to go. Two, as you added, that also this actual offense or conviction doesn't trigger it either. So let's — that's one and two. That's part of those shields. But I want to — the question is this. When it gets to 2016, because the conviction is different now, one, because the status of citizenship is different now, two, because he's told and actually the order is signed before — right before him in open court, what then allows the Padilla problem of 2010, which is being under wrong advice, to extend beyond 2016? That's my question. Well, in 2016, when he's — when he loses his citizenship and then he's — and he's now a legal permanent resident — Right. — he's told that he faces the prospect of removal. That's — that's clear. But he doesn't — he could have been removed based on the 2016 conviction, in which case he would have a defense to removal. He does not know what the basis of removal is going to be until 2018, when he gets that notice to appear. And it doesn't say crime involving moral turpitude. It doesn't say you're removable — But you don't assert that his lawyer told him something anew in 2016 that was wrong? So I think what — Is that right? You don't assert that the lawyer told him something anew in 2016 that was wrong? No, Your Honor. OK. So — OK. I think — I think the lawyer was correct. He could have been removed based in 2016, based on — on that. But there's a big difference, as we've said, between having an aggravated felony and having another type of conviction. Just very briefly, Your Honor, we've been talking a lot about what he said about 2016. But the only statement that he makes regarding his knowledge of an aggravated felony in 2016 is on 422 of the Joint Appendix. Did he ever tell you — question, did he ever tell you that this methamphetamine charge was an aggravated felony? Answer, no, I never know it was an aggravated felony. I know it was an aggravated felony in 2016. That's when I know it was an aggravated felony. I didn't even know nothing. And then the follow-up question was, did you find out it was an aggravated felony when you got the notice to appear? Yes, correct. So he doesn't say, my lawyer told me in 2016 that it was an aggravated felony. He doesn't say anything specific about that. All the things he's talking about, his lawyer telling him, are related to the reasons that he is losing his citizenship and faces the prospect of removal. So his claim does not accrue until he actually gets the notice to appear in 2018, and he and that happened in 2010. And so for those reasons — Last question, as Judge Agee started us off with, and you just ended up with, he did say 2016. Of course, you said that's evidence of his being misspoken. Yes. What's your best argument that that's enough that we should remand this for the district court to clear up that factual question? Your Honor, the district court relied on a number of factors. Many of them were related to the representations that were made in 2016 in court, and for the reasons I've already stated, those aren't sufficient. If the court wants to hang its hat on this one statement, which is directly — Well, actually, he said it twice, because you omitted reading what's on page 421, which I read earlier when I asked you about this. Well, on 421, he talks about knowing he was going to get deported. But he doesn't — Right. When my attorney in Alexandria explained it to me. But he doesn't say that he knows that it's an aggravated felony. The only time he talks about it being an aggravated felony is on 422. Which is part of the explanation by the Alexandria attorney. That's clear from the questions that are being asked. Well, his Alexandria — I dispute that, but I think to go to Judge Gregory's question, where you're looking at, he says aggravated felony in 2016, but he also says previously and in much more detail that he actually found this out in 2018 when he got the notice to appear. There's this conflict in the record that the district court never resolved. And so if the court is — if this is the basis, then it should be returned to the district court for factual balancing. Except he explains. All the assumptions about the Strickland claim are assumptions that we read into the one-sentence advice that you're not going to be deported because you're a citizen. He then says, I never knew in my life I was going to get deported until 2016 when my attorney explained it to me, everything about the questions. So it seems to me if the advice was the assumption, this is what I'm assuming, he — when he got the advice in 2010 that he'd never be deported because he was a citizen, he had to assume that statement meant, even though the attorney didn't say it, that you would never get deported. That's the — that would be the ineffective advice or his assumption. And here on page 421, he says, I never knew in my life I was going to get deported until 2016 when my attorney and Alexandra explained it to me, everything about the questions. So doesn't that put him on notice for the first time that the understanding he had about what the attorney said in 2010, if he assumed it, was a wrong assumption? No, Your Honor, because he knows in 2010 — 2016, even when he loses his citizenship, he still had citizenship in 2010. So again, when we're talking about 2010, we're talking about what he understands about the impact of his citizenship on his methamphetamine conviction. If I — if — when he learns that his citizenship has been revoked, the reasonable understanding of that would be, I no longer have my citizenship. It's not necessarily clear that he would — But we're — keep forgetting we're focusing on the advice given to him. And that sentence I read to you focuses on the advice, which is, I did not understand that I could ever lose my citizenship and be deported. And he now says, in 2016, I now learned about it, as my attorney explained. And it seems to me, when we're focusing on a Strickland claim, and that's what we're doing — I mean, this claim is, you know, brought many years after 2010. Okay, I understand your position, I think. I'm not sure. But — Well, I see my time is up. I — thank you, Your Honor. Counsel, you have 30 seconds to respond to Judge Niemeyer, or to us. You have only 30 seconds. Go ahead. I'll do my best, Your Honor. So he — when he is talking about removal and understanding that he has lost his citizenship, he may have understood that he has lost his citizenship. But that does not mean that he understands that his attorney's advice is wrong. As to that methamphetamine conviction, that is what matters, not will you ever lose your citizenship. His lawyer wasn't his lawyer for immigration purposes. He was his criminal attorney. And so he could still understand — That's what you're challenging, is the advice of the criminal lawyer in 2010. Yes. And I have not understood what aspect of that advice he claims was ineffective. Telling him. And so I've given him assumptions. If you focus on that claim, it's a perfectly correct statement. Telling him that he could not be removed based on — telling him that he does not face deportation, when, in fact, he does face — No, he didn't say that. Yeah. He said, you are — you will not be deported because you are a citizen. That's what he said. And that is repeated. That's the ineffective advice. In the context of the methamphetamine conviction. Thank you, Your Honor. Thank you so much. Counsel, both of you, thank you so much for your arguments. We would love to come down and greet you with our handshakes in our normal tradition. But due to the circumstances, we cannot. But no, nonetheless, we very much appreciate your arguments and being here. And wish you all well. Be safe and stay well. Thank you, Your Honor. Thank you. Thank you. Thank you.
judges: Roger L. Gregory, Paul V. Niemeyer, G. Steven Agee